Cooke, J.
The three cases under review raise the fundamental question of whether the Deputy Attorney-General, for his part in the ongoing investigation of the nursing home industry, has subpoena power as provided in subdivision 8 of section 63 of the Executive Law.*
Deputy Attorney-General Hynes appeals from an order of the Appellate Division, First Department, which unanimously affirmed judgments of the Supreme Court, New York County, in Matter of Sigety v Hynes and Matter of East Riv. Nursing Home v Hynes. Each such judgment restrained Hynes from proceeding in excess of his lawful jurisdiction and quashed a subpoena duces tecum issued by him. Additionally, Kent Nursing Home appeals from an order of the Appellate Division, Second Department, which reversed an order of the Supreme Court, Westchester County, that had granted Kent Nursing Home’s application to quash a similar subpoena in. Matter of Kent Nursing Home v Office of Special State Prosecutor for Health & Social Servs. Because of the identity of *264 central issue, these cases were argued and are now considered together.
On January 10, 1975, in response to growing concern as to the quality of care provided by private nursing homes receiving public financial assistance, the Governor, in Executive Order No. 2 (9 NYCRR 3.2) and pursuant to section 6 of the Executive Law, appointed a commissioner to head an official inquiry, looking into, among other things, the ownership, financing and control of nursing homes and residential facilities to the end of insuring "that nursing homes and homes which shelter the aged and disabled provide the highest quality of care with the greatest degree of economy.” For, as the Governor stated in the preliminary paragraph of his Executive Order (9 NYCRR 3.2): "When public funds are channeled through private hands to finance health and residential services, government must insure that those funds are used honestly and efficiently in the promotion of the public welfare. The compassionate purpose of programs of residential and health care must not be subverted by the improper diversion of public funds for private benefit, nor through the inability of government to control the use of such funds under present regulatory structures.”
The commissioner, thereby appointed, was directed "to study, examine, investigate, review and make recommendations with respect to the management and affairs of any department, board, bureau, or commission of the State exercising any direction, supervision, visitation, inspection, funding or control of any nongovernmental nursing home, residential facility or home”. To assist him in his investigation he was granted subpoena power and "[e]very State department, division, board, bureau, commission, council and agency” was instructed to "provide to the Commissioner every assistance, facility and cooperation”.
In connection with the above-described investigation of the nursing home industry, and with acknowledgment of the January 10, 1975 appointment by the Attorney-General of Charles J. Hynes as Deputy Attorney-General to act as prosecutor to inquire into possible criminal violations in the nursing home industry, the Governor on February 7, 1975 issued Executive Order No. 4 (9 NYCRR 3.4). Finding it to be in the public interest to inquire into "matters concerning the public peace, public safety and public justice with respect to possible criminal violations committed in connection with or in any *265 way related to the management, control, operation or funding” of any nursing home or health related facility, the Governor directed that there be such inquiry and conferred upon the Attorney-General the appropriate powers and duties as specified in subdivision 8 of section 63 of the Executive Law. Prior to these directives, the Commissioners of Health and Social Services each had written to the Attorney-General requesting investigation pursuant to subdivision 3 of section 63 of the Executive Law of possible violation of the Public Health and Social Services Laws and it was subsequent to these requests that the Deputy Attorney-General had been appointed.
While a request made upon the Attorney-General in accordance with either subdivision 3 or 8 would serve to initiate investigation, the powers and duties of the Attorney-General are detailed with more particularity in the latter. Subdivision 8 begins as follows: "Whenever in his judgment the public interest requires it, the attorney-general may, with the approval of the governor, and when directed by the governor, shall, inquire into matters concerning the public peace, public safety and public justice.” Said subdivision continues by providing, inter alia, that "[t]he attorney-general, his deputy, or other officer, designated by him, is empowered to subpoena witnesses, compel their attendance, examine them under oath before himself or a magistrate and require the production of any books or papers which he deems relevant or material to the inquiry” and by requiring that the Governor be provided with a detailed weekly report of the progress of the inquiry.
The subpoenas sought to be quashed were issued pursuant to subdivision 8 of section 63 of the Executive Law. The petitioner in each instance asserts that said subdivision does not serve as authority for issuance of such process. A similar challenge had been made to subpoenas issued pursuant to this statute in Matter of Di Brizzi (Proskauer) (303 NY 206). There, an investigation had been ordered by the Governor to be conducted by the Attorney-General and "officers of the Department of Law”, denominated collectively as the New York State Crime Commission. Subpoenas, issued by the commission in connection with the executive directive (p 211) " '[t]o investigate generally the relationship between organized crime and any unit of Government anywhere in the state’ ”, were unsuccessfully sought to be quashed. As this court stated in Di Brizzi (p 210) the words "inquire into matters concerning *266 the public peace, public safety and public justice”, employed in subdivision 8, are to be interpreted in their usual and ordinary sense and are not to be limited by a narrow and technical meaning. We there asserted that although it was a war emergency that brought about legislative recognition of the need for such a provision, the Legislature, in enacting said statute employed general terms and did not, either expressly or by implication, limit its operation to a time of war. "A general law may, and frequently does, originate in some particular case or class of cases which is in the mind of the legislature at the time, but so long as it is expressed in general language, the courts cannot, in the absence of express restrictions, limit its application to those cases, but must apply it to all cases that come within its terms and its general purpose and policy” (People ex rel. McClelland v Roberts, 148 NY 360, 368, cited as authority in Matter of Di Brizzi [Proskauer] supra, at p 214).
Widespread corruption in the nursing home industry, care of the elderly and infirm and compensation for that care from the public treasury are "matters concerning the public peace, public safety and public justice” just as organized crime and its relationship to units of government were held to be in Di Brizzi. To be distinguished, as it was in Di Brizzi, is a situation such as that found in Ward Baking Co. v Western Union Tel. Co. (205 App Div 723) where the Governor directed the Attorney-General pursuant to the provisions of then section 62 of the Executive Law to inquire into the circumstances surrounding the death of Clarence E. Peters. The Appellate Division stating that the investigation therein was "directed and conducted with the sole purpose in view of obtaining proof that the individual Ward killed the individual Peters with malice aforethought” (p 727), concluded that subdivision 8 of then section 62 was not, nor could have been, intended to provide for criminal investigation against a particular individual.
Here, as in Di Brizzi, the court recognizes that there exists a reasonable relation between the action taken by the Governor, through the Attorney-General, and the proper discharge of the executive function. Investigations pursuant to Executive Orders Nos. 2 and 4 serve to inform the Governor, who, so informed, can more adequately fulfill the obligations of his office.
In Sigety, Special Term here noted that the Attorney-Gen *267 eral as an "Executive Official” has been authorized in other circumstances to utilize various investigative powers, including the subpoena power, in order to protect the public interest (e.g., Executive Law, §63 subd 12 [persistant fraudulent or illegal acts]; Executive Law, § 69 [crimes against the elective franchise]; General Business Law, § 343 [monopolies]; General Business Law, § 352 [securities fraud]; Business Corporation Law, § 109 [annul or dissolve corporation for cause]). Although the Attorney-General has often served the dual function of investigating and prosecuting, this court has never held, nor should it now hold, that his authority to issue subpoenas to investigate alleged violations of law is impaired by his obligation to prosecute such violations. Recently, in Matter of Greenthal & Co. v Lefkowitz (32 NY2d 457, 463), an exercise of subpoena power under section 352 of the General Business Law was upheld, the court noting that the article under which it is granted "is not only geared to prevent fraud, deception and wrongdoing” but is also "to assure investigation 'upon complaint or otherwise’ and appropriate civil or criminal follow-up procedures when wrongdoing, in fact, is found.” As clearly indicated in Dunham v Ottinger (243 NY 423, 433), these statutes do not bestow judicial powers upon the Attorney-General. "He decides nothing in a judicial way. He passes upon no question of civil violation or of criminal guilt. The ultimate and only end to which he can proceed is by action or criminal prosecution to submit to the courts the question whether a person has been guilty of such unlawful practices that he should be enjoined from farther pursuing them or should be subjected to a criminal prosecution. Everything which he does leading up to this point is the performance of an executive or administrative power such as has long been recognized as perfectly appropriate and valid and whatever judicial decision follows is made by the courts. It is the performance of administrative duties by an executive official and in no sense the decision of justiciable questions exclusively delegated to the jurisdiction of judicial tribunals.”
The subpoenas, here issued pursuant to subdivision 8 of section 63 of the Executive Law, call attention to the provisions of section 73 of the Civil Rights Law reproduced on the reverse side of the process. In People v Mitchell (40 AD2d 117, 121-122), the Appellate Division, Third Department, found that investigation of criminal conduct by the State Investigation Commission under said Civil Rights Law section met the *268 constitutional requirements of due process and did not taint the defendant’s subsequent indictment.
The issue of the Fifth Amendment privilege against self incrimination was raised by petitioner Kent Nursing Home and was properly disposed of by the Appellate Division. It is important to note that, while the Supreme Court in Beilis v United States (417 US 85) held that a partner in a small law firm may not invoke his personal privilege so as to justify noncompliance with a subpoena requiring production of the partnership’s financial records, that court did indicate that the result might be different if a small family partnership had been involved, citing to United States v Slutsky (352 F Supp 1105). In Slutsky, the test of United States v White (322 US 694, 701) was applied to determine whether the records of a two-brother partnership which operated a large resort, known as the Nevele Country Club, were to receive the protection of the Fifth Amendment. Simply, the test is "whether one can fairly say under all the circumstances that a particular type of organization has a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only.” Under the factual circumstances, the Slutsky court determined that "[i]f the Nevele were owned by a sole proprietor, there can be no question that the records would be immune from production under the Fifth Amendment. The reason for such protection does not change because there is a shared proprietorship” (p 1107).
A nursing home is not by its nature a family business which the owners can run in any manner they choose. It falls within the definition of a "hospital” under section 2801 of the Public Health Law and, as such, is subject to extensive State regulation pursuant to article 28 of said law and title 10 of the Official Compilation of Codes, Rules and Regulations of the State of New York. Additionally, a nursing home receiving Medicaid funds must keep and make available to the appropriate State agency records regarding patient care and payments, pursuant to title 42 of the United States Code (§ 1396a, subd [a], par [27]). It is for these and similar reasons that a nursing home, albeit family-run, cannot rely on Slutsky.
In Matter of Sigety v Hynes and Matter of East Riv. Nursing Home v Hynes the order appealed from should be reversed and the petitions dismissed, with costs. In Matter of *269 Kent Nursing Home v Office of Special State Prosecutor for Health & Social Servs. the order appealed from should be affirmed, with costs.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur;
In Matter of Sigety v Hynes and Matter of East Riv. Nursing Home v Hynes: Order reversed, etc.
In Matter of Kent Nursing Home v Office of Special State Prosecutor for Health & Social Servs.: Order affirmed.

 Formerly section 62 of the Executive Law. (See L 1951, ch 800.)