Chief Judge Breitel.
Defendants, owners of a proprietary nursing home, appeal from an affirmance of a judgment of Supreme Court, after trial, which enjoined defendants from barring two physicians, husband and wife, from visiting their patients in the nursing home. The exclusion resulted from practices which defendants found objectionable, including alleged overvisiting, improper billing, and refusal to comply with administrative directives.
The issue is whether a physician, excluded from a private nursing home in good faith and on objectively reasonable grounds, is entitled to a judicial hearing and determination to establish the truth of the facts upon which the otherwise reasonable grounds depend.
The order of the Appellate Division should be reversed, and a new trial ordered. At common law, a private proprietary hospital or nursing home could bar a physician for any reason or for no reason. Section 2801-b of the Public Health Law changed the common-law rule to permit exclusion of a physician for reasons limited to patient welfare, institutional objectives, and character or competency of the physician. The *378 statute does not, however, authorize plenary judicial review of every exclusion of a physician. Consequently, judicial review may assure only that the exclusion was made in good faith and on objectively reasonable grounds. Since the legal standard applied below was incorrect, there must be a new trial.
Defendants Edward and George Straussman have owned and operated a nursing home and health-related facility, the Grace Plaza of Great Neck, since May, 1972. Plaintiffs, Allan and Maxine Fried, were granted visiting privileges not long after the Grace Plaza was opened by the Straussmans. By 1974, the Frieds had been designated personal physicians for about 50 of the home’s approximately 200 residents. Dr. Allan Fried visited the home several times a week and Dr. Maxine Fried much less frequently, perhaps a dozen times a year.
The Frieds apparently were in frequent conflict with the administration of the nursing home. In 1973, they left for a two-week summer vacation without notifying the home so that their substitute physician could, when necessary, be located. They refused to adhere to a policy forbidding the use of mechanically reproduced physicians’ orders, and objected to other administrative policies. The Frieds apparently acquired as patients 20 of Grace Plaza’s residents at the expense of other physicians treating patients at the home.
More significant, however, is that the administration received complaints of overvisiting and improper billing by the Frieds. All of their patients at Grace Plaza were covered by Medicare and most by Medicaid, and, given the advanced age and deteriorating physical condition of many of the patients, the potential for abuse was present. The unfavorable public image of nursing homes, combined with the widespread publicity of Medicaid and Medicare abuses, would naturally have made any charges of improper billing or overvisiting matters of concern to the Grace Plaza administrators.
Finally, on January 31, 1975, Dr. Allan Fried, on his own initiative and without consulting the Grace Plaza administration, called the Nassau County Police to report an alleged sexual assault on one of his patients by a security guard nearly two days earlier. The home administrators had already investigated the matter and, after interviewing and examining the alleged "victim”, concluded that there had been no criminal assault. The implicated guard was nevertheless discharged. Thus, the Straussmans were understandably disturbed by the sudden appearance of uniformed police.
*379 On February 4, four days later, the Frieds’ visiting privileges were revoked. Faced with arrest as trespassers if they attempted to re-enter the nursing home, plaintiffs brought this action on February 7. A temporary restraining order was served on the Straussmans simultaneously. On February 26, a preliminary injunction was issued, and, after trial without a jury, a permanent injunction was entered on May 19, 1975. The Appellate Division affirmed, with one Justice dissenting.
The evidence on the trial was in sharp conflict, especially the opinion evidence supplied by experts offered by both parties on the issue of overvisiting. Similarly, there was conflict on the issue of the occasion for calling the police, and the one instance of the "false billing”. Depending on the fact finder’s view of the conflicting evidence, the issues could have been decided either way, and either way would have been supported by sufficient evidence.
At the outset, plaintiffs’ vaguely outlined constitutional and Federal statutory claims should be rejected. State regulation of nursing homes is not "state action” sufficient to require a due process hearing before a physician may be excluded from the home (cf. Jackson v Metropolitan Edison Co., 419 US 345, 350, 358-359; Ascherman v Presbyterian Hosp., 507 F2d 1103, 1104-1105; Mulvihill v Butterfield Mem. Hosp., 329 F Supp 1020, 1024). Moreover, the nursing home’s exclusion of the physicians, at least perhaps so long as the patients were able and free to move, does not deprive Medicare or Medicaid patients of any right, constitutional or statutory, to free choice of a physician. On the submitted and present analysis, plaintiffs’ only legal remedy must come from the Public Health Law.
Subdivision 1 of section 2801-b of the Public Health Law provides, in relevant part: "It shall be an improper practice for the governing body of a hospital to * * * terminate or diminish in any way a physician’s * * * professional privileges in a hospital, without stating the reasons therefor, or if the reasons stated are unrelated to standards of patient care, patient welfare, the objectives of the institution or the character or competency of the applicant.” "Hospital” is defined to include nursing homes (§ 2801, subd 1; see Matter of Sigety v Hynes, 38 NY2d 260, 268, cert den sub nom. Kent Nursing Home v Office of Special State Prosecution, 425 US 974). Section 2801-c provides for injunctive relief in the event that violations occur.
It is true that the Frieds were excluded from the nursing *380 home before they were provided with explicit, written reasons for the home’s action. Previous communications between the Frieds and the Grace Plaza administration, however, notified the physicians of the sources of dissatisfaction. Moreover, explicit reasons were set forth in an affidavit in opposition to plaintiffs’ motion for a preliminary injunction. Mere failure to provide reasons at the moment of exclusion should not forever bar a hospital or nursing home from excluding a physician when satisfactory reasons do exist and are communicated to the physician on request. Hence, the home’s failure to provide stated reasons on its own initiative should not be dispositive of the case.
As noted earlier, the statutes marked a change from the common-law rule that, absent a contractual obligation to the contrary, denial of visiting privileges constituted no legal wrong (Leider v Beth Israel Hosp. Assn., 11 NY2d 205, 208-209; Van Campen v Olean Gen. Hosp., 210 App Div 204, 209, affd 239 NY 615; Halberstadt v Kissane, 31 AD2d 568; Exclusion of Physician by Hospital, Ann., 37 ALR3d 645, 659-661). No longer may a physician be denied professional privileges arbitrarily (Matter of Fritz v Huntington Hosp., 39 NY2d 339, 348; but see General Municipal Law, § 128, subd 4, providing that the board of managers of a municipal hospital may remove physicians “at pleasure”). Reasons must be given for any termination, and those reasons must relate to legitimate concerns of the hospital or nursing home: patient care, patient welfare, objectives of the institution, or competency of the physician.
Thus, in Matter of Fritz v Huntington Hosp. (supra), where physicians were denied visiting privileges for reasons assertedly wholly unrelated to proper concerns of the hospital, judicial intervention was warranted. In the Fritz case, physicians who were originally trained at osteopathic colleges, but later fully licensed as general physicians, and who had completed fully accredited intership programs, were denied privileges solely because of their failure to complete American Medical Association accredited formal training programs (pp 341-343). No questions as to the competency of the physicians were raised.
In Fritz, the only question presented immediately of interest was whether the stated reason for the exclusion was related to institutional concerns and needs, and the matter was remitted to Special Term for a determination. There was no need to *381 consider whether the stated reasons were fabrications of the hospital administration, since it was conceded that the osteopathic physicians had not completed the AMA programs. It was not necessary, therefore, in the Fritz case to consider whether the underlying facts upon which the hospital acted were true or false, let alone to determine whether a hospital has the right to act on apparent facts as reasonably perceived by it.
One must not confuse the issue in the Fritz case with the one involved in this appeal. The issue in Fritz was whether the grounds for refusing hospital privileges to the osteopathic physicians were "related” to standards of patient care, patient welfare, and the objectives of the institution. On that issue the physicians had invoked the intervention of the Public Health Council, whose findings of unrelatedness were, under the statute, prima facie evidence in any judicial action or proceeding (Public Health Law, §§ 2801-b, 2801-c). In this case, plaintiffs never invoked the jurisdiction of the Public Health Council and, as stated above, the relatedness of the exclusion was never in doubt. Had plaintiffs invoked the jurisdiction of the Public Health Council on the issues in this case, any findings it made would have been prima facie evidence of the facts, namely, whether the grounds for exclusion were related or unrelated, and also whether the grounds were objectively reasonable and were, as later discussed, sincere and authentic. Even the Public Health Council, viewing the matter as it must from a different perspective—whether cause exists to credit the complaint of the individual physician—is limited in the scope of its inquiry. It, too, is not concerned with the ultimate truth or falsity of the fact of physician misconduct alleged. Rather it is charged with responsibility to determine whether there existed objectively reasonable grounds for the physician’s complaint and whether it was made in good faith and not for some impermissible ulterior reason.
The statutory language indicates only that the reasons stated must be related to one of the various institutional concerns; there is no explicit requirement that the reasons have any basis in truth. In subdivision 1 the statute refers to the statement of reasons for exclusion and requires that they be related to the statutory standards. Subdivision 3 requires the Public Health Council, upon investigation of a proper complaint and finding that there is cause for crediting of the allegations of the complaint, to direct that the governing body *382 of the hospital make a review of its actions in excluding the affected physicians. There is no reference to an inquiry by the council to determine the ultimate truth of the underlying facts upon which the physician’s complaint was made or the hospital’s actions were based. (For convenience Public Health Law, § 2801-b, is set forth in full in an appendix to this opinion.)
But, of course, it would be a strange reading of the statute or of its policy which would allow devious administrators to circumvent the legislative intent by fabricating reasons which are baseless, but which, if substantiated, would be related to institutional concerns. Good faith, at least, should be required. There must be reasons, but they must be authentic ones, not pretenses.
What should not be authorized or required is what has already taken place in this case, namely, a judicial hearing to determine the ultimate truth of the facts upon the basis of which the physicians may have been excluded. That determination is not one that courts, under the present legislation, are authorized or required to make.
This case illustrates the point. The Frieds allegedly overvisited many of their Medicaid and Medicare patients. If the allegation is true, it justifies excluding them from practice in Grace Plaza. But, if there is a reasonable objective basis for the administrators to have acted as they did, the administrators, in the absence of legislation much more restrictive than the present, should not be required to establish the ultimate truth of the apparent facts on which they reasonably relied.
Several of the other reasons advanced by defendants for excluding the plaintiffs from Grace Plaza were similarly not frivolous. Dr. Fried’s call to the police, which resulted in the appearance of uniformed police in the nursing home, could have been seriously destructive of both the institutional objectives and the patients’ welfare. So too, the failure to notify the home of a two-week summer vacation could have jeopardized the lives of the Frieds’ elderly patients.
It is true, as said earlier, that the evidence at trial conflicted as to the merits of the Frieds’ visiting practices and as to the medical benefits of using individually written rather than mechanically reproduced physicians’ orders. Moreover, reasonable explanations were offered for Dr. Fried’s call to the police and for the failure to notify Grace Plaza of the Frieds’ vacation plans. But it was not the province of the courts to *383 decide whether the ultimate truth behind these grounds justified the exclusion; rather, the court should have restricted itself to a determination whether the purported grounds were reasonably related to the institutional concerns set forth in the statute, whether they were based on the apparent facts as reasonably perceived by the administrators, and whether they were assigned in good faith.
It has become a justified commonplace to deplore conditions in nursing homes, and to look to government regulation as a corrective measure. But stripping the administration of a hospital or nursing home of discretion to make even the most basic personnel decisions would not necessarily solve the problems of abuse and neglect. The Legislature has not thus far taken such an approach, and the courts are therefore required to engage in only a limited review of the determinations of hospital administrators.
Accordingly, the order of the Appellate Division should be reversed, with costs to abide the event, and the action remitted to Supreme Court for a new trial.
APPENDIX
PUBLIC HEALTH LAW § 2801-b
§ 2801-b. Improper practices in hospital staff appointments and extension of professional privileges prohibited.
1. It shall be an improper practice for the governing body of a hospital to refuse to act upon an application for staff membership or professional privileges or to deny or withhold from a physician, podiatrist or dentist staff membership or professional privileges in a hospital, or to exclude or expel a physician, podiatrist or dentist from staff membership in a hospital or curtail, terminate or diminish in any way a physician’s, podiatrist’s or dentist’s professional privileges in a hospital, without stating the reasons therefor, or if the reasons stated are unrelated to standards of patient care, patient welfare, the objectives of the institution or the character or competency of the applicant.
2. Any person claiming to be aggrieved by an improper practice as defined in this section may, by himself or his attorney, make, sign and file with the public health council a verified complaint in writing which shall state the name and address of the hospital whose governing body is alleged to have committed the improper practice complained of and which shall set forth the particulars thereof and contain such other information as may be required by the council.
3. After the filing of any such complaint, the public health council shall make a prompt investigation in connection therewith. In conducting such investigation, the public health council is authorized to receive reports from the governing body of the hospital and the complainant, as the case may be, and the furnishing of such information to the public health council, or by *384 the council to the governing body or complainant, shall not subject any person or hospital to any action for damages or other relief. Such information when received by the public health council, or its authorized representative, shall be kept confidential and shall be used solely for the purposes of this section and the improvement of the standards of patient care and patient welfare. The records of such proceedings shall not be admissible as evidence in any other action of any kind in any court or before any other tribunal, board, agency, or person. If the council shall determine after such investigation that cause exists for crediting the allegations of the complaint, the council shall promptly so advise the governing body of the hospital against which the complaint was made, and shall direct that such governing body make a review of the actions of such body in denying or withholding staff membership or professional privileges from the complainant physician, podiatrist or dentist or in excluding or expelling such physician, podiatrist or dentist from staff membership or in curtailing, terminating or in any way diminishing such physician’s, podiatrist’s or dentist’s professional privileges in the hospital.
4. The provisions of this section shall not be deemed to impair or affect any other right or remedy.