**In re Dr. John DOE, M.D., A Witness Before the January 1982 Additional Grand Jury.**

**Dr. John DOE, M.D., Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 1579, Docket 83–6111.**

United States Court of Appeals, Second Circuit.

Argued June 13, 1983.
Decided June 29, 1983.

David F. Axelrod, New York City (Peter L. Zimroth, Kostelanetz & Ritholz, New York City, of counsel), for appellant.

Philip Le B. Douglas, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Roanne L. Mann, Asst. U.S. Atty., New York City, of counsel), for appellee.

Before FRIENDLY, KEARSE and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

We are called upon to decide whether a grand jury has the power to subpoena a physician's W–2 forms, prescription forms and patient files despite his claims that the Fifth Amendment and doctor-patient privilege shield these records from production. A grand jury sitting in the Southern District of New York is investigating what it believes to be a sham medical clinic that served as a front for the illegal sale of tens of thousands of "quaaludes" in New York City. The records subpoenaed are those of a psychiatrist allegedly associated with the clinic. The Court is unanimous in its view that the doctor's W–2 and prescription forms are subject to the subpoenas duces tecum issued against him and that for his failure to produce them he was properly held in civil contempt. We are divided only on the issue of patient files in the doctor's possession.

## BACKGROUND

In 1981 the Drug Enforcement Administration (DEA) commenced an investigation of Jorum Associates, Inc. and a number of individuals associated with Jorum, including Dr. Doe. Concluding that it had unearthed sufficient evidence of narcotics violations to establish probable cause, the DEA applied for and obtained a warrant in May 1982 to search Jorum's East 34th Street premises.

As the record reveals, the government furnished evidence that Jorum and those associated with it were engaged in large-scale illegal distribution of quaaludes to both consumers and street dealers. The government's proof describes the following operation. Jorum hired doctors who were paid on the basis of days worked. Dr. Doe, for example, worked one day per week from late 1981 until early 1982. For each of the eight days Dr. Doe worked he was paid $3,000 by Jorum. The medical specialties represented at the clinic were extraordinarily diverse, including acupuncture, surgery, osteopathy, gynecology and, in Dr. Doe's case, psychiatry. Those who came to Jorum, and they came daily by the score, were given a perfunctory physical by a medical assistant and a brief interview with one of the doctors. Over 90% of the individuals who visited Jorum obtained quaalude prescriptions for 30 to 60 tablets each. All that was required of a patient to obtain such a prescription was a claimed sleeping difficulty, denial of drug abuse, and cash payment of a $150 to $200 fee. Dr. Doe saw over 590 patients—an average of more than 70 per day—while associated with Jorum.

That this assembly-line technique for prescribing drugs had little or nothing to do with the practice of medicine is tellingly revealed in the affidavit of an undercover DEA agent who came to Jorum and saw Dr. Doe on December 3, 1981 and again two weeks later. On each visit the agent adopted a different identity and name without changing his appearance, drawing no comment from anyone. On both occasions the agent received a prescription from Dr. Doe for 45 quaaludes after paying a $200 fee.

With this sort of evidence before it, the grand jury issued subpoenas duces tecum directing appellant to produce his patient files, financial records and Schedule II prescription forms.[1] The issuance of these subpoenas prompted a battle of *ex parte* filings by Doe and the government seeking *in camera* review by United States District Judge Stewart. On December 13, 1982, after reviewing the open and *in camera* submissions of the parties, the district court concluded that the "required records" exception to the Fifth Amendment overcame appellant's objection to compelled production of his Schedule II prescription and W–2 forms and patient files. The trial court later held that no psychotherapist-patient privilege should apply in this case and ordered production of the subpoenaed patient files in their original, unredacted condition. When Dr. Doe declined to comply, he was held in civil contempt and this appeal followed.

## DISCUSSION

### I

■ In assessing whether appellant may rely on a Fifth Amendment privilege not to comply with the subpoenas duces tecum, it is first necessary to determine whether the act of producing the documents described in the subpoenas would involve compelled, testimonial self-incrimination on Doe's part. *See Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *In re Katz,* 623 F.2d 122, 125–26 (2d Cir.1980). In relevant portion the subpoenas seek

(1) All patient files relating to persons purportedly treated by [Doe] on the premises of Jorum Associates ... [and its successor entities] ... in the period August 1981—June 1982;

(2) ... IRS Form[s] W–2, relating to [Doe's] compensation by Jorum Associates, Inc. [and its successor entities];

(3) All Schedule II prescription forms reflecting drugs prescribed by [Doe] at [Jorum's and its successors' premises].

[(4)] All patient files relating to persons purportedly treated for sleep and stress problems in the period March-June 1982;

[and (5)] All Schedule II prescription forms reflecting drugs prescribed in the period March-June 1982.

Because Jorum and its successor entities are alleged by the government not to be sleep

---

1. Schedule II drugs possess a high potential for abuse but have recognized medical uses. *Whalen v. Roe,* 429 U.S. 589, 592, 97 S.Ct. 869,

872, 51 L.Ed.2d 64 (1977); *see* N.Y. Pub. Health Law § 3306 (McKinney 1977 & Supp. 1982–1983).

disorder clinics but actually fronts for the illegal distribution of controlled substances, any admission on appellant's part that he is associated or connected with these organizations could be self-incriminating. Thus, even appellant's mere production of items 1, 2 and 3, apart from their content, might involve his incriminating admission that these documents exist and that he was in some way connected with Jorum.

█ Moreover, since items 1 and 4 consist of an inordinate number of files considering the time periods involved (as the government suggests), simply turning over these files could constitute incriminating testimony by Doe that he "treated" this unrealistic number of patients during the specified periods. Similarly, since the subpoenas call upon Doe to surrender what may be an inappropriately large number of forms reflecting his prescriptions of controlled substances during limited time periods (see items 3 and 5), the mere act of compelling Doe to produce these documents could be compelling him to be a witness against himself. Thus, the act of complying with these subpoenas could require appellant's compelled, testimonial self-incrimination and may therefore give rise to a Fifth Amendment privilege not to comply.

## II

█ Having decided that the mere act of surrendering these documents to the government may be testimonial in nature, we turn to the issue of whether their production is mandated by the so-called "required records" exception to the Fifth Amendment. *See Shapiro v. United States,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948). Under this exception, a person whose records are required to be kept by law has no Fifth Amendment protection against self-incrimination when these records are directed to be produced. This rule applies regardless of whether the records are kept pursuant to federal or state law. *See id.* at 17–18 & n. 25, 68 S.Ct. at 1384 &

n. 25. To constitute "required records" the documents must satisfy a three-part test: (1) the requirement that they be kept must be essentially regulatory, (2) the records must be of a kind which the regulated party has customarily kept, and (3) the records themselves must have assumed "public aspects" which render them analogous to public documents. *See Grosso v. United States,* 390 U.S. 62, 67–68, 88 S.Ct. 709, 713, 19 L.Ed.2d 906 (1968).

█ We have little difficulty applying the required records exception to the W–2 and Schedule II prescription forms. With respect to the W–2s, a wage earner filing a federal income tax return must attach a W–2 in order for the return to be complete. This requirement, found on the face of the tax form, has the force of law, *see* I.R.C. § 6011(a) (1976), and is part of the regulatory scheme established by the Internal Revenue Service. That the W–2s are records of a kind customarily kept by taxpayers is not open to dispute, and the public aspect requirement appears satisfied simply from the fact that the taxpayer is required to attach copies of his W–2 when filing, *see Shapiro v. United States, supra.*

As for the Schedule II prescriptions, New York law requires practitioners [2] to prepare "official New York State prescriptions" for all Schedule II drugs and retain copies for five years. *See* N.Y.Pub.Health Law §§ 3332 & 3338(2) (McKinney 1977). These statutes are part of a comprehensive scheme established by the New York State Legislature to prevent harmful drugs from "being diverted into unlawful channels," *Whalen v. Roe,* 429 U.S. 589, 591, 97 S.Ct. 869, 872, 51 L.Ed.2d 64 (1977). Thus, these records are maintained pursuant to a regulatory scheme, *cf. United States v. Warren,* 453 F.2d 738, 742 (2d Cir.) (record keeping required under 21 U.S.C. § 360a(d) for certain controlled substances held to be part of a regulatory scheme), *cert. denied,* 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972),

**2.** A practitioner is defined as a "physician, dentist, podiatrist, veterinarian, scientific investigator, or other person licensed, or otherwise permitted to dispense, administer or conduct research with respect to a controlled substance

in the course of a licensed professional practice or research licensed pursuant to this article." N.Y. Pub. Health Law § 3302(28) (McKinney 1977).

and are of the kind customarily kept by the regulated party. The public aspect of the prescription is demonstrated by the requirement that a copy of it must be forwarded to the New York State Department of Health. *See* N.Y.Pub.Health Law §§ 3331(6) & 3333(4) (McKinney 1977); *cf. United States v. Warren,* 453 F.2d at 742 (similar scheme has public aspect).

The more troublesome issue concerns the patient files in Dr. Doe's possession. The New York Board of Regents (Regents) is charged with regulating the medical profession. *See* N.Y.Educ.Law §§ 6504, 6506 & 6520 (McKinney 1972 & Supp.1982–1983). Sections 6509(9) and 6511 of the Education Law (McKinney Supp.1982–1983) permit the Regents to define unprofessional conduct and to impose sanctions for such conduct. In the health professions, unprofessional conduct includes the failure "to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient." 8 N.Y.C.R.R. 29.2(a)(3) (1981). It is evident that Dr. Doe's patient files were kept pursuant to this regulatory scheme and are of a kind customarily maintained by the regulated party. His argument focuses on the third element. He contends that the patient files possess no public aspect and are not, therefore, required records.

■ Although what is needed to show public aspect is somewhat clouded, *see The Supreme Court, 1967 Term,* 82 Harv.L.Rev. 63, 201 (1968), we harbor no doubt that it is satisfied here. As defined by the Regents, unprofessional conduct includes the failure of a health practitioner, upon written request by the patient, to make available a patient file to the patient or another licensed health practitioner. 8 N.Y.C.R.R. 29.2(a)(6) (1981). Standing alone, this reference gives us little confidence that the patient files exhibit some public aspect, inasmuch as it is the patient alone who may trigger the release of the information. To this reference must be added the provisions of N.Y.Pub.Health Law § 230(10)(a) (McKinney Supp.1982–1983), which permit the New York State Board for Professional Medical Conduct (Board) to "investigate on its own any suspected professional misconduct." Subdivision (10)(*l*) of this statute expressly authorizes the Board to obtain and examine patient records "in any investigation or proceeding by the board acting within the scope of its authorization." Every time Dr. Doe assembled a patient file at Jorum, he knew or should have known that the file was subject to review by the State. Records made under those circumstances have a public aspect. With this element satisfied, we hold that the patient files are required records.

We agree with our respected colleague Judge Friendly's view that even *Shapiro* recognizes constitutional limits on the government's power to compel record keeping which might circumvent the privilege contained in the Fifth Amendment. In this case we think, however, that there is a strong correlation between the purpose of the New York law which requires that patient files be kept and that for which their production is sought here. The purpose of New York's regulation is to investigate licensed physicians suspected of medical misconduct, *Schachter v. Whalen,* 581 F.2d 35, 37 (2d Cir.1978) (per curiam), which certainly encompasses improperly prescribing controlled substances, *see* 8 N.Y.C.R.R. § 29.-2(a)(8) (1981) ("ordering of excessive . . . treatment . . . not warranted by the condition of the patient" constitutes unprofessional conduct). The conduct for which Dr. Doe is being investigated by federal authorities is precisely that conduct proscribed by the New York State law here applicable.

■ Doe argues that even if the subpoenaed documents are required records, *Fisher* nevertheless shields them from production. We note that the required records doctrine is an *exception* to the Fifth Amendment privilege. As such, it necessarily overrides the privilege in instances in which the privilege would otherwise apply. *See In re Grand Jury Empanelled March 19, 1980,* 680 F.2d 327, 336 n. 15 (3d Cir.1982), *cert. granted on other issues,* —— U.S. ——, 103 S.Ct. 1890, 77 L.Ed.2d 281 (1983); *In re Grand Jury Proceedings,* 601 F.2d 162, 171 (5th Cir.1979). *Fisher* was not concerned with required records and nothing in

its analysis could be construed as weakening the required records exception.

### III

Appellant next contends that he need not surrender his patient files because to do so would violate his patients' psychotherapist-patient privilege. Proposed Federal Rule of Evidence 504(b) would have created a psychotherapist-patient privilege in the federal courts, but Congress declined to adopt it.[3] Instead, Fed.R.Evid. 501, which controls the privileges of witnesses, provides that such privileges "shall be governed by the principles of common law as they may be interpreted by the courts of the United States in the light of reason and experience" on a case-by-case basis, *Trammel v. United States,* 445 U.S. 40, 47, 100 S.Ct. 906, 910, 63 L.Ed.2d 186 (1980). Since no doctor-patient privilege existed at common law, *Whalen v. Roe,* 429 U.S. 589, 602 n. 28, 97 S.Ct. 869, 877 n. 28, 51 L.Ed.2d 64 (1977), most courts which have considered the matter have concluded that none exists in federal law, *see e.g., United States v. Meagher,* 531 F.2d 752, 753 (5th Cir.) (psychiatrist-patient privilege), *cert. denied,* 429 U.S. 853, 97 S.Ct. 146, 50 L.Ed.2d 128 (1976); *United States v. Mullings,* 364 F.2d 173, 176 n. 3 (2d Cir.1966) (dicta); *In re Grand Jury Subpoena,* 460 F.Supp. 150, 151 (W.D.Mo.1978); *Hardy v. Riser,* 309 F.Supp. 1234, 1236–37 (N.D.Miss. 1970); *cf. Lord v. Board of Education of the City of New York,* 74 F.R.D. 565 (E.D.N.Y. 1977) (recognizing a limited privilege outweighed by other considerations before the court).

■ We are asked to recognize the privilege but decline to do so in this case for several reasons. To begin, Professor Wigmore has set forth four conditions necessary to the establishment of a privilege against the disclosure of communications. They are: (1) the communication must be one made in the belief that it will not be disclosed; (2) confidentiality must be essential to the maintenance of the relationship between the parties; (3) the relationship should be one that society considers worthy of being fostered; and (4) the injury to the relationship incurred by disclosure must be greater than the benefit gained in the correct disposal of litigation. 8 J. Wigmore, *Evidence* § 2285, at 527 (McNaughton rev. 1961). Arguably these conditions could obtain in a true psychotherapist-patient relationship. *See Slovenko, Psychiatry and a Second Look at the Medical Privilege,* 6 Wayne L.Rev. 175, 184–99 (1960). But the relationship in this case does not meet all four conditions. Presumably those visiting the Jorum clinic wanted the fact and purpose of their visit kept in confidence, but there was hardly any relationship of trust since it appears that Dr. Doe did not even recognize his "patient" of two weeks earlier. The 70 patient per day assembly-line technique involving only a brief interview is scarcely a psychiatrically nurturing event for a patient, much less one worth fostering.

Wigmore's fourth condition recognizes the balancing which must be done when an asserted privilege contravenes a principle fundamental to the fair administration of justice—that the public has a right to everyone's evidence. Testimonial privileges are permitted only to the very limited extent that excluding relevant evidence " 'has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.' " *Trammel v. United States,* 445 U.S. at 50, 100 S.Ct. at 912 (quoting *Elkins v. United States,* 364 U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting)). Here the exclusion of Doe's patient files would not serve a public good that transcends the need for this evidence in the search for truth. As the court below noted following *in camera* examination of a sampling of patient files, there are no communications in these files of the intensely personal nature that the psychotherapist-pa-

---

3. In states which have adopted the privilege it is often subject to many exceptions and grounds for waiver, *Whalen v. Roe,* 429 U.S. 589, 602 n. 28, 97 S.Ct. 869, 877 n. 28, 51 L.Ed.2d 64 (1977) and authorities cited therein, and criminal prosecutions in particular are frequently withdrawn by statute from the operation of the privilege, C. McCormick, *Evidence* § 104, at 223 & n. 76 (2d ed. 1972) and statutes cited therein.

tient privilege is designed to protect from public scrutiny.[4] There is also no need to redact the names of the supposed patients before surrender of the files because there is substantial evidence indicating that no real psychotherapist-patient relationship existed between Doe and the persons whose identities appear in the files.

## IV

■ Finally, Doe contends that it was error for the district court to read in camera ex parte submissions from the government. In an order dated May 13, 1983 the district court specifically noted that while it had considered these submissions for background information, it did not rely on them and the information they provided was not necessary for its decisions. Upon review of the record, we are satisfied that the district court could have reached the same result without resort to the in camera submissions. In any event, this Court has recently approved the use of in camera submissions by the government in situations where an "ongoing interest in grand jury secrecy" is at stake. In re John Doe Corp., 675 F.2d 482, 490 (2d Cir.1982); see In the Matter of a Grand Jury Subpoena directed to Marc Rich & Co., A.G., 707 F.2d 663 at 670 (2d Cir. 1983). We note further that, save only for the names of potential witnesses, the government made extensive and detailed disclosure to appellant of the underlying facts. The information provided was sufficiently ample to allow him a full and fair opportunity to be heard, see In re John Doe Corp., 675 F.2d at 489–90.

For the above reasons the order holding Dr. Doe in civil contempt is affirmed. The mandate of the court shall issue forthwith.

FRIENDLY, Circuit Judge, concurring in part and dissenting in part:

I join in upholding the subpoenas compelling disclosure of the Schedule II forms showing drugs prescribed by Dr. Doe at the two locations mentioned and the IRS W–2 forms relating to his compensation from three named corporations. The prescription forms, one copy of which finds its way to the New York State Department of Health, N.Y. Public Health Law §§ 3332, 3333 (1977), were not simply required records but public records. Moreover, New York's purpose in requiring them was the same as the Government's in the grand jury investigation here, the regulation of the traffic in dangerous drugs. Since the forms are thus excepted from the privilege against self-incrimination, the exception includes their production despite the fact that testimony is thereby compelled. See In re Grand Jury Proceedings, 601 F.2d 162, 171 (5 Cir.1979). Whether or not the W–2 forms were also within the required records exception, they were prepared by Dr. Doe's employers and not by him, and stand no differently than the accountants' letters and workpapers which were required to be produced in Fisher v. United States and United States v. Kasmir, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). I also join in Parts III and IV of Judge Cardamone's opinion. However, I respectfully dissent from so much of the opinion as would compel Dr. Doe to produce the patient files.

One of the subpoenas required Dr. Doe to produce all patient files relating to persons purportedly treated by him at three locations between August 1981 and June 1982; another required him to produce all patient files relating to persons purportedly treated for sleep and stress problems between March and June 1982. A sample of such a file submitted in camera by Dr. Doe contains five parts—a ten-page Confidential Personal Medical History and a five-page Sleep Disorder Study, both filled in by the patient; a record of physical examination; a "Structured Interview Form for Sleep Disorder" filled in by someone on Dr. Doe's behalf; and a single page filled in mainly by Dr. Doe which records his diagnosis and prescription. My focus will be on the two latter portions, and I will refer to them for convenience as the patient files.

---

**4.** In fact, perusing these files is somewhat like attempting to read Egyptian hieroglyphics, so that even without a testimonial privilege these patient files' undecipherable contents remain inscrutable.

I think it clear and do not understand my colleagues to dispute that, apart from the required records exception, Dr. Doe could successfully invoke the self-incrimination privilege against production of these files. It is, of course, immaterial that the files may not have been *bona fide* patient files, and that Dr. Doe may have been engaging in shady practices. Any idea that the privilege exists mainly for protection of the innocent vanished long ago. It is true that by a series of Supreme Court decisions, most of which are analyzed in *United States v. Beattie I*, 522 F.2d 267, 271–74 (2 Cir.1975), *taxpayer's petition for certiorari denied, Government's petition for certiorari granted and cause remanded,* 425 U.S. 967, 970, 96 S.Ct. 2163, 2165, 48 L.Ed.2d 791 (1976), the shield given to business records by the constitutional privilege is narrow. *Wilson v. United States*, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911), denied a claim of privilege by the president of a corporation with respect to copies of letters and telegrams which were signed by him but constituted company records. *United States v. White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944), reached the same result concerning a claim by an assistant supervisor with respect to union records. *Bellis v. United States*, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974), came to the same conclusion with respect to the records of a three-man law partnership.[1] On another front, *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), held that a taxpayer could not assert the privilege with respect to his own records which were in the possession of an accountant. *Fisher v. United States* and *United States v. Kasmir, supra,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39, came to the same conclusion with respect to taxpayers' asser-

tions of the privilege with respect to accountants' papers in the taxpayers' hands.[2]

None of these decisions, however, denies that an individual's own papers in his own possession are within the constitutional privilege, even though they relate to business rather than "personal" matters. Such was the Fifth Amendment ruling in *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), which dealt with business records, indeed as Justice Frankfurter demonstrated in his dissent in *Shapiro v. United States,* 335 U.S. 1, 67–68 & n. 19, 68 S.Ct. 1375, 1408–09 & n. 19, 92 L.Ed. 1787 (1948), "required records". Even though "[s]everal of *Boyd's* express or implicit declarations have not stood the test of time", see *Fisher v. United States, supra,* 425 U.S. at 407, 96 S.Ct. at 1579, and under *Bellis* "the precise claim sustained in *Boyd* would now be rejected for reasons not there considered", 425 U.S. at 408, 96 S.Ct. at 1579, namely, their status as partnership records, see note 1 *supra,* the holding with respect to an individual's business records, perhaps most clearly put in Justice Miller's concurring opinion, 116 U.S. at 639, 6 S.Ct. at 537, remains intact. Justice Hughes made clear in *Wilson v. United States, supra,* 221 U.S. at 378–79, 31 S.Ct. at 543, that a quite different result would have been reached if the subpoena had demanded Wilson's private papers. In *White* the Court again took note that "[n]o valid claim was made that any part of them [the subpoenaed documents] constituted his own private papers", 322 U.S. at 704, 64 S.Ct. at 1253. *Bellis* emphasized that, small as the partnership was, petitioner was holding the records in a "representative capacity" and it was on that account that "his personal privilege against compulsory self-incrimination is inapplicable." 417 U.S. at 101, 94 S.Ct. at

---

1. The Court recognized, 417 U.S. at 95 n. 2, 94 S.Ct. at 2186 n. 2, that *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), had upheld a claim of privilege by a partner with respect to partnership records but stated that "at this early stage in the development of our Fifth Amendment jurisprudence, the potential significance of this fact was not observed by either the parties or the Court."

2. In fact the taxpayers had transferred possession to their attorneys but the Court considered that the taxpayers had retained whatever Fifth Amendment privilege they had had, 425 U.S. at 398–99, 96 S.Ct. at 1574–75, and that documents transferred from a client to his attorney for the purpose of obtaining legal advice need not be produced by the attorney if the client himself would be privileged from producing them, *id.* at 404–05, 96 S.Ct. at 1577–78.

2189. The question how a person can be ordered, consistently with the language of the self-incrimination clause, to produce his own records of business dealings under circumstances when he cannot be required to testify about such dealings remains unanswerable. *Fisher* did not deal at all with an individual's privilege concerning his own papers in his own possession; it simply refused to extend the privilege to include papers of another that were in his possession, 425 U.S. at 414, 96 S.Ct. at 1582. This court thus had no difficulty in holding on the post-*Fisher* remand in *Beattie* that the privilege extended to the taxpayer's own letters to the accountant of which he had regained possession. We did not "read *Fisher* and *Kasmir* as detracting from the principle that the Fifth Amendment protects against compulsory production of a paper written by an accused with respect to his own affairs . . . and now in his possession . . ." *United States v. Beattie II,* 541 F.2d 329, 331 (2 Cir.1976). No subsequent decision by the Supreme Court or by this court suggests any reason to alter that view. Dr. Doe is thus constitutionally protected against having to produce at least the Structured Interview Form and the diagnosis page of the patient files unless the required records exception applies.

The required records exception, established by an opinion, *Shapiro v. United States, supra,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787, joined by five Justices with four in dissent, has been problematic from the outset. Justice Frankfurter protested that "[i]f records merely because required to be kept by law *ipso facto* become public records, we are indeed living in glass houses",

335 U.S. at 51, 68 S.Ct. at 1401, and that "[i]f Congress by the easy device of requiring a man to keep the private papers he has customarily kept can render such papers 'public' and non-privileged, there is little left to either the right of privacy or the constitutional privilege", *id.* at 70, 68 S.Ct. at 1410. Justice Jackson, joined by Justice Murphy, also thought that "[t]he protection against compulsory self-incrimination, guaranteed by the Fifth Amendment, is nullified to whatever extent this Court holds that Congress may require a citizen to keep an account of his deeds and misdeeds and turn over or exhibit the record on demand of government inspectors, who then can use it to convict him." 335 U.S. at 70, 68 S.Ct. at 1410.[3] Thirty-five years after its pronouncement, the contours of the exception remain largely undefined. In *Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967), where the New York Court of Appeals had disbarred an attorney for refusing to produce required records on the ground of self-incrimination, the Supreme Court was asked to overrule *Shapiro.* It reversed without finding it necessary to reach that question, 385 U.S. at 517–18, 87 S.Ct. at 629 (plurality opinion).[4] *Marchetti v. United States,* 390 U.S. 39, 56–57, 88 S.Ct. 697, 706–07, 19 L.Ed.2d 889 (1968), and *Grosso v. United States,* 390 U.S. 62, 67–68, 88 S.Ct. 709, 713, 19 L.Ed.2d 906 (1968), held that *Shapiro* did not validate a requirement of registration before engaging in the business of accepting wagers or of monthly filing of information with respect to wagering activities. Justice Harlan wrote in *Grosso,* 390 U.S. at 68, 88 S.Ct. at 713:

---

**3.** These views have found echo in commentary. See, e.g., Meltzer, Required Records, the McCarran Act, and the Privilege Against Self-Incrimination, 18 U.Chi.L.Rev. 681, 712 (1951) ("a bizarre result in a constitutional system"); Note, Constitutional Limits on the Admissibility in the Federal Courts of Evidence Obtained from Required Records, 68 Harv.L.Rev. 340, 342–45 (1954); Maguire, Evidence of Guilt, § 2.09(3) (1959); 8 Wigmore, Evidence § 2259c at 364 (McNaughton rev. 1961) ("The logic of the situation is most difficult"); Mansfield, The *Albertson* Case: Conflict Between the Privilege Against Self-Incrimination and the Government's Need for Information, 1966 Sup.Ct.Rev.

103, 148–49 (A "hodgepodge of half-convincing explanations contributed to the shaky foundations upon which the *Shapiro* decision was raised".); McKay, Self-Incrimination and the New Privacy, 1967 Sup.Ct.Rev. 193, 215–17; M. Berger, Taking the Fifth 184–85, 188 (1980).

**4.** Justice Fortas, concurring, would have been "prepared in an appropriate case to re-examine the scope of the principle announced in *Shapiro v. United States,* 335 U.S. 1 [68 S.Ct. 1375, 92 L.Ed. 1787] (1948)", but was "not prepared to indicate doubt as to the essential validity of *Shapiro.*" 385 U.S. at 520, 87 S.Ct. at 630.

The premises of the doctrine, as it is described in *Shapiro,* are evidently three: first, the purposes of the United States' inquiry must be essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind which the regulated party had customarily kept; and third, the records themselves must have assumed "public aspects" which render them at least analogous to public documents.

The criticisms of the required records exception suggest caution against its expansion. As has been said, Mansfield, *supra,* 1966 Sup.Ct.Rev. at 148–49:

> The notion that because a disclosure is required the privilege does not apply, if extended to its full logical reach, is capable of entirely destroying the privilege.

Certainly this is true with respect to records. Here the third element of the *Grosso* definition is principally in question. Patients' files would seem, almost by description, to be the antithesis of a record with "public aspects." They typically contain intimate details with respect to physical or psychological ailments, diagnoses, and treatments which patients are reticent in revealing and the secrecy of which physicians are sworn to protect. They are contended nevertheless to have "public aspects" because they must be disclosed on demand of the patient or when required for reimbursement of the patient by a third party, 8 N.Y.C.R.R. § 29.2(a)(6) (1981), and are subject to compulsory production by

subpoena to the State Board for Professional Medical Conduct, when acting within its authorized scope of authority to investigate professional misconduct, subject to requirements of confidentiality and anonymity for the patient. N.Y. Public Health Law § 230.10(k) & (*l*) (1982 Supp.).

To hold that this particularized lifting of privacy directed by New York [5] makes the files subject to compulsory production on behest of the United States in a grand jury investigation of violation of the narcotics laws would expand the public records exception considerably beyond the facts of *Shapiro.* There Congress had directed that the records be kept for the very purpose of providing information concerning compliance with wartime price control statutes and regulations which the Government charged the defendants with violating. As in *Wilson v. United States, supra,* 221 U.S. at 382, 31 S.Ct. at 545, obedience to the subpoena was compelled because "the books and papers [were] held subject to examination *by the demanding authority*" (emphasis supplied). Here New York's record keeping provisions were for the benefit of patients and professional licensing authorities,[6] not for that of the United States in enforcing the federal narcotics laws. The unusual nature of a doctrine permitting the legislature to create a class of private records not enjoying the constitutional privilege demands at least that there be some significant correlation between the purpose

---

**5.** Protection of privacy is only one of the seven policies of the constitutional privilege listed in *Murphy v. Waterfront Commission,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964). Its genesis was in Judge Frank's dissent in *United States v. Grunewald,* 233 F.2d 556, 581–82 (2 Cir.1956), *rev'd without discussion of this point,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

**6.** It is by no means clear that New York would apply the required records exception if a New York prosecutor sought to compel production of the patient files in an investigation of violations of New York's narcotics laws. One lower New York court has held the required record exception inapplicable to patients' medical records subpoenaed from a practitioner charged with sexually abusing his patients, *People v. Cohen,* 98 Misc.2d 874, 876, 414 N.Y.S.2d 642,

643 (Dist.Ct.1979), although a limited production was compelled on the ground that the patients' right of access to the records prevailed over the practitioner's Fifth Amendment claim. In several cases involving nursing home abuses, New York courts have found the exception applicable to nursing home patients' medical records as well as financial records, but have refused to compel the production of the former on the basis of the physician-patient privilege, *Lewis v. Hynes,* 82 Misc.2d 256, 261–63, 368 N.Y.S.2d 738, 744–45 (Sup.Ct.1975), *followed in Kent Nursing Home v. Office of the Special State Prosecutor for Health & Social Services,* 49 A.D.2d 616, 370 N.Y.S.2d 669 (2d Dept.) (compelling production only of nonmedical records required under 10 (N.Y.C.R.R. 730.-6), *aff'd sub nom. Sigety v. Hynes,* 38 N.Y.2d 260, 379 N.Y.S.2d 724, 342 N.E.2d 518 (1975).

of requiring the records and that for which their production is sought. The *Shapiro* opinion recognized this when it said, 335 U.S. at 32, 68 S.Ct. at 1391–92:

It may be assumed at the outset that there are limits which the Government cannot constitutionally exceed in requiring the keeping of records which may be inspected by an administrative agency and may be used in prosecuting statutory violations committed by the record-keeper himself. But no serious misgivings that those bounds have been overstepped would appear to be evoked when there is a sufficient relation between the activity sought to be regulated and the public concern so that the Government can constitutionally regulate or forbid the basic activity concerned, and can constitutionally require the keeping of particular records, subject to inspection by the Administrator.

Professor Mansfield has written, *supra,* 1966 Sup.Ct.Rev. at 149:

The fact that the legislature has required that records be kept, however, or has authorized an administrative agency to require it, at least constitutes an authoritative expression of the importance of the governmental interest involved and the necessity of self-reporting to protect that interest.

Here Congress has made no determination that enforcement of the narcotics laws re-

quires doctors to maintain patients' files and produce them before grand juries, and New York has opened such files only for two purposes unrelated to what the Government seeks here. To say that, because of these two New York provisions, the portions of the patient files which were made up by the doctor are being held by him merely as a custodian for the patient or the licensing board is to substitute fiction for reality.[7]

Decisions of this court applying the required records exception do not assist the Government. The lawyer's records in *United States v. Silverman,* 449 F.2d 1341, 1345–46 (2 Cir.1971), *cert. denied,* 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972), were not merely required records but public records, i.e., records filed with a public body. Moreover they were obtained not by a subpoena from the defendant but with the assent of the holder of the records, the Appellate Division, First Department, so that under *Couch v. United States* the lawyer had no privilege at all. In *United States v. Warren,* 453 F.2d 738, 742 (2 Cir.), *cert. denied,* 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972), the records were required by a federal statute having the purpose of regulating the very conduct with which Dr. Warren was charged.[8] This also was the situation in *United States v. Kaufman,* 429 F.2d 240, 247 (2 Cir.), *cert. denied,* 400 U.S. 925, 91 S.Ct. 185, 27 L.Ed.2d 184 (1970), and

**7.** The majority accepts much of the analysis. It also seems to abandon one of the New York provisions urged by the Government, namely, the regulation requiring disclosure of the records on demand of the patient or when required for his reimbursement, and relies solely on the availability of the records to authorities who might be investigating Dr. Doe for professional misconduct, notably, the "ordering of excessive tests, treatment, or use of treatment facilities not warranted by the condition of the patient," 8 N.Y.C.R.R. § 29.2(a)(8) (1981). It is not clear to me that this provision, especially when read in context, would cover Dr. Doe's alleged misconduct. Moreover, New York's interest in disciplinary action is quite different from the Federal Government's interest in criminal sanctions.

**8.** Dr. Warren was charged with and found guilty of selling, delivering, and disposing of amphetamine sulphate. The federal statute un-

der which he was convicted required him to make and keep records on the disposition of amphetamine, and the records in question consisted only of patient names and notations of the number of injections given, the dates, and the charges made for them. As this court specifically noted, 453 F.2d at 742, "[t]hey contained no other medical information."

To the same effect is *United States v. Rosenberg,* 515 F.2d 190, 199–200 (9 Cir.) (opinion by Judge Lumbard, sitting by designation), *cert. denied,* 423 U.S. 1031, 96 S.Ct. 562, 46 L.Ed.2d 404 (1975), a prosecution of a physician for federal narcotics law violations, in which a subpoena for "patient records as they related to the dispensation of narcotic substances" was found to be within the required records exception insofar as it compelled production of prescription records required to be kept by a state statute whose "only purpose ... is to aid in the enforcement of the drug control statutes".

*Donovan v. Mehlenbacher*, 652 F.2d 228, 231 (2 Cir.1981). More nearly apposite, and tending to favor Dr. Doe, is *In re Katz*, 623 F.2d 122 (2 Cir.1980).[9] Also tending in his favor is *United States v. Campos-Serrano*, 430 F.2d 173, 176–77 (7 Cir.1970), *aff'd on other grounds*, 404 U.S. 293, 92 S.Ct. 471, 30 L.Ed.2d 457 (1971).

The purposes for which New York required Dr. Doe to maintain patient files were too remote from the subject of the Government's investigation to justify abrogation of what would otherwise have been his constitutional privilege against compelled production of his own papers over his claim of self-incrimination. The subpoenas should have been modified accordingly.

**9.** In *Katz* an attorney successfully resisted a subpoena to produce "public documents" in his possession, specifically file copies of articles of incorporation otherwise untraceable to his clients, sought by a grand jury investigating possible violations of the Arms Export Control Act of 1954.